Good morning. Good morning, Your Honors. I'm Robert Grizzard. I'm here representing Worthy McGuire, who is the appellant herein. Worthy is and was an employee of the United Parcel Service, and we are here essentially on... I think it comes down to one question. What is temporal proximity? Now, the case law had been, and may continue to be in this kind of a case, that temporal proximity is measured from a certain time. The court below measured it from the... She was looking for the date of the applications for workers' compensation, and she measured, and to a great extent, that plus, in the second time, the time of the second application. So if we accepted your argument, then you would measure it from May 2013, and the date that we would look at would be May 2013, when he was going to come back to work, and we would say, as far as this issue, the workmen's compensation issue, we would say, you've got to measure it that way, and it was almost the same day. Isn't that basically your argument? That's true concerning the May, after the second FCE, he was sent back with not full, excuse me, full release, but for a lesser category, because he did still have a few issues from that first FCE. Is he capable of working at that point? I beg your pardon? Is he capable of working as a package driver at that point? I was unclear on that score. He got a limited lifting limits. Yes, sir. If he had not been taking narcotic drugs, which he was at that point, he wouldn't be fully qualified. He obviously couldn't drive with narcotic drugs, but assuming he didn't take those for pain purposes, took Tylenol or some ibuprofen or something like that, was he physically able to do the job after the first FCE? That's a question. Yes, sir. I believe he was. Well, I guess that's what the release says. But then later on, he got a better FCE, right? Yes, sir. He clearly exceeded standards. The first one said that he could not do very heavy. The second one said he could do heavy to very heavy, but encouraged him not to do the very heavy in the testimony, but that's what it was about. Let's go back to the narcotics again. On page 9 of your brief, paragraph 8, you state in May, that would be 2013, he was still prescribed some narcotics, was weaning off them, and not using narcotics after the last prescription was issued July 2013. Yes, ma'am. So from May until at some point after that last prescription, he was using narcotics, weaning off them. Is that correct? That's the evidence we have, ma'am. And looking back at the doctor's letter on May the 6th, the doctor states that, that he can't drive if he's using hydrocoding, and that he was using it on the day of the sectional, the second functional capacity evaluation. And at the end of the letter, Dr. Rodriguez says he can't take the hydrocoding while he's on the job. Yes, ma'am. Is that a fair statement? I would like to clarify that what that FCE said was that when the second one was done, that Mr. McGuire said that he had taken during the day. That did not mean, or that he had taken it previously. That did not necessarily mean that he had taken it just before the exam or was still under the influence. I think that's an inference that can be drawn, but not necessarily. Well, the doctor went ahead in his deposition and explained the prescription process. And just, if you count the pills, he was still taking the pills because he got a quantity of 40, and he was told to take them every six hours. And so on April the 2nd, then he got a refill request on April the 23rd. And if you do the math, he was either taking the pills or throwing them away or whatever. He was taking the pills. What's not clear is that he would have had to have taken the pills to do the job. And there is a colloquy with the doctor, Dr. Rodriguez, that we had, and I can't cite specifically at the moment, but can you say how fast that would clear his system? Had he taken some, say, the night before, would he be cleared to work in the morning? That's what we were going for, and that's what we thought we had established, but maybe we didn't. But I think the real problem here is that the court didn't even bother to look at that. Right, but let's focus on the prima facie showing on an ADA case. You've got to establish three things. One, that he's disabled, or he was perceived as being disabled, which is the route you're taking here. Two, that he's qualified, he's a qualified individual. Three, that he was subjected to unlawful discrimination because of disability. Let's assume for the purposes of my question, you made a prima facie showing about the first and the third. They perceived him as being disabled, and they discriminated him on account of that disability. The central question here is, is there, are there material, for me, are there material facts in dispute concerning the second element, whether or not he is qualified? And it's an interesting issue here because you do get this letter from Rodriguez. He sends a note to UPS. It's dated May the 16th, 2013, if I have it right. He says, based on the information of both functional capacity evaluations, he is released to full duty with no restrictions. That suggests to me he can work. He's qualified. Yes, sir. Then it goes on to say, Worthy has informed me his employer has an inside warehouse position available for him. I think he'd be a good candidate for that based on the information of his FCEs. And then we come to the final statement. He can take anti-inflammatories for minor aches and discomfort, but cannot take narcotics while on the job. I don't understand the letter. If Rodriguez is prescribing OxyContin to him, both before the date of the letter, at the time of the letter, and after the letter, and he's actually on Oxy at the time, that's plainly a narcotic drug. How could he have been released to full duty with no restrictions? I guess what I'm saying is I don't understand what's going on here. I believe what the doctor was trying to say was, if he continues to take the Oxy, he can't do that. But I can prescribe. He was on the Oxy at the very time doctor said he can be released to full duty with no restrictions, notwithstanding the fact that he's on narcotics. But by the way, he can't take narcotics. I understand that. But in what you just quoted, the doctor also said, I can prescribe other medications for his relief. At least that's the way we took it. And when Mr. McGuire But could he have been qualified if he was on Oxy at the time? Isn't the answer plainly no, according to what Rodriguez says? If he was taking it and it affected his work, yes, sir. He doesn't say anything about effect. He doesn't say anything about affected his work. Maybe he had a strong constitution and the Oxy didn't have much effect on him or maybe the dosage wasn't high enough. He says he's fully able to work, but he can't take narcotics on the job. Yes, sir. But he also says there are other pain relievers that he could take in order to perform the job. Right. But he continued to prescribe. It wasn't that he was telling him to take ibuprofen or something like that, cortisone, pregnazone. He says you can't take narcotics, but I'm going to continue to prescribe them. And I do continue to prescribe them. That's where I'm just I'm sort of hung up at that point because it looks to me and maybe I don't have it right, that you can't meet that second element of establishing a prima facie showing that he was qualified to do this job if he was on narcotics at the very time the determination is made. Maybe I've misunderstood something here. I don't know that you have, Your Honor, because if he was, the way that note was read by my client and by the union representative is he was released. If he did not take narcotics to drive or in any of that, and yes, he did continue for a while, but he never got a job offer. How long does he continue on the Oxy? I'm sorry? How long does he continue taking OxyContin after the May 16, 2013 letter from Dr. Rodriguez? The last prescription he received I believe was in July, but at that point when that last prescription, it was clear from what my recollection of the doctor's testimony was that he was taking less of it, that he didn't need as much as he had before, and that he was weaning. We're talking May, June, July, two months maybe. I have another question, and that is leaving the prima facie case. If the company understood that he was taking narcotics during this period of time that his doctor was prescribing him, why wouldn't that be a legitimate non-discriminatory reason not to give him a job? They simply don't want a person driving who is on narcotics. Yes, but the company never said it that way, Your Honor. What they did was when Mr. McGuire appeared with this release saying full, but no narcotics, the supervisor said, well, we can't employ you, but we can't tell you why, and we can't write down why. Didn't they just keep saying take that 5% off on the disability, and wouldn't that go to your workman's comp claim, not to the discrimination claim? Well, I think it may go to both, Your Honor, but that 5% was established with the first claim, workers' compensation. The focus of the company on all their letters was we want that taken off, and Dr. Rodriguez said, no, I'm not going to take that off. He's 5% disabled. I mean, isn't that weird? He said he had a 5% impairment. Impairment, yes. He corrected me on that. Yeah. But that was from the first workers' comp claim, and I think it's... Well, counsel, that wouldn't have affected his ability to drive, according to Dr. Rodriguez. I know you're answering that way because you think that's where I'm going. Let's assume that's not where I'm going. The 5% would in no way affect his ability to drive, according to Dr. Rodriguez. Right. But according to Dr. Rodriguez, the taking of OxyContin would affect his ability to drive, and he was taking it during this period of time. Dr. Rodriguez, as I understood it, was very careful to say, no narcotics while working. Not, you can't take them. I mean, he... Is your position, then, that this narcotics question, and the way it affects, perhaps affects the analysis here, is something that is a disputed question, and therefore, summary judgment should have been denied? Yes, sir. During that period? What is the cutoff period? Certainly by July, everything had shifted now to the inside job. The doctor was saying he couldn't do the outside job, he couldn't lift things, he couldn't climb stairs, and so forth. Well, at that point, that's a cutoff at least as far as the government, the company's having a legitimate non-discriminatory reason not to give him a driver position, correct? If they had enunciated it that way. Well... Yes, sir, but they did not. What they kept saying is, we do not have work for you. He's now saying that I can't do, his doctor's now saying, I don't have the capability of doing that work. That driver's job is too tough. It's a shifted position because he's now looking for sort of an accommodation in a warehouse position. Well, when I questioned Dr. Rodriguez about that particular thing, and he seemed to indicate that those restrictions, ladder climbing, et cetera, applied only while he was under the influence of a narcotic. That it did not, if he was not under the influence of a narcotic, affect him. And those restrictions were ones that had been imposed in the first workers' comp claim, and after that workers' comp claim, UPS put him back to work as a driver, which is how he got injured the second time. So, if they would put him back to work that first time with those restrictions, I think it's not, as it takes to be a word, I don't think it's a legitimate statement. I think it's a pretextual statement. Is it your view that he was qualified to drive during this relevant period of time because to the extent he was taking Oxycontin, to the extent he was taking opioids, he was doing it at night, not by day during the actual time when he was driving? Is that what I heard you to say a little earlier? That's what I believe was true, Your Honor. Does he, just, if I could follow up, does anyone support that proposition? Does any medical expert say that he would be qualified to drive by day if he took this dosage of Oxy at night? The closest we have in the record, Your Honor, is my questioning of Dr. Rodriguez. Can you say when he would be, would you say when he would be out of the influence and could he take it? And Dr. Rodriguez declined to say, said maybe, maybe not. It's an individual thing. So, was he asked in the deposition, here's the dosage, if he took this dosage at night, was he qualified to drive by day? Answer yes, answer no, answer maybe, I don't know. I mean, did that colloquy happen? Not exactly that way, but generally speaking that way and the answer was yes, I'm not going to say. Maybe he was qualified and maybe he wasn't. He wasn't sure. But the problem we have is that initially he was cleared to go back to work in March under the first FCE. Yes, he was taking narcotics at that time and probably more heavily than he was by May, but he still was qualified to drive. And when we get to the later times, when in fact he continues, I mean, this man went without any employment. No, understood. And they turned him down and he repeatedly asked for 21 times and he was in March through July. March through November, sir. Well, November, but certainly through July, which is when he changed his whole approach. He wasn't looking for that particular job anymore. He was looking for a warehouse job. Correct? He looked for a warehouse job because he was told that there would be a warehouse job. Right. That would give him full-time employment. It turned out... At that time he had no employment at all. Right. I understand that. But the whole narcotics point, which I don't think you can gloss over, is rather serious here. If he wasn't qualified because he was on narcotics or could take narcotics, there was no definitive statement that he wasn't going to be taking narcotics, and he was being prescribed narcotics, how do you say he was qualified to do the job? Because taking narcotics while driving is, apart from the fact that it may be criminal, is certainly an impairment of that ability. But I can only rely on the fact that the doctor said he is fully qualified except. The exception we're talking about here. Qualified. And then later, and as I said, when he went into, after the May statement from the doctor and said, okay, I'm fully released, they didn't say, oh, you can't because you're taking narcotics. They said, we're not offering you a job and we can't tell you why and we can't even write it down. Now, later, when he was, well, after he was employed under, I would point out, an ADA contract in November, that's what it was. It was an ADA placement. Then he applied, for example, for an air driver, and the doctor said he could do the air driving. He had applied for driving around within the complex before that, and the doctor said that's fine. He could do that specifically. And there was no reference to that he was taking OxyContin or OxyCodone at that time. All right, counsel, I don't mean to cut you off, but we've gone ten minutes over your direct, you're answering our questions. If you can continue and use, if you want to use up the balance of your rebuttal or just save it for rebuttal. I leave it to you. All right, thank you. Good morning, Your Honors. Frances De La Guardia. Good morning. Good morning. On behalf of the appellee at counsel table, Christine Gay, also on behalf of the appellee UPS. Your Honors, to answer your question, he was not released. I keep hearing he was released to go back to work, but he was not released to go back to being a package driver. Never. On March 2013, he was given a lifting restriction. He could only do medium to heavy. The job of a package driver required heavy lifting. He then was offered an accommodation because of that FCE when he went back, and he refused it. He then went back and asked for another FCE. Did the company say at that time you can't get the job because it requires heavy lifting? Did it notify him to that effect? This is limited lifting. Your FCE says you have limited lifting capabilities. Therefore, we're not giving you a job because that is what the job requires, more heavy lifting. I don't believe that's in the record, and if it is, I don't – So you're saying it, and I don't know whether you're saying it as a matter of fact or just argument that we should – No, it's a matter of fact because the FCE says it, and Dr. Rodriguez, when his deposition was taken, said, yes, it's true, he was medium to heavy at first. I know that the FCC says that, but the question is what does the job require? Can you work with the medium to heavy? The functional – I believe in the record there was a description of the job, and it did require the heavy lifting, and in the FCE it said he couldn't lift over 70 pounds, and I believe the union rep, and I don't know exactly, also said that that is generally what is required. So UPS relies on the FCE and the report of the doctor to determine whether the employee can go back to that particular job, and I think that's the crux of the case here, that Mr. McGuire felt that he was released to go back to full-time duty, but not full-time duty as a package driver, which was the job that he had. Of course, the irony in this case is the employer encourages him by one light or pressures him by another to accept an ADA accommodation, which apparently he doesn't want, and then finds him ineligible for an accommodation because he's able to perform the essential functions of his initial job. Isn't that what happened here? Well, what happened, Your Honor, was indeed he did in the March 2013 FCE was not able to go back to package driver, and because of that, automatically he was referred to ADA accommodation, which he refused, and then he went back and requested a second on his own accord in order to be cleared to go back as a package driver. Unfortunately, as the panel has noted- Because he was able to perform the essential functions of his initial job? If he was off narcotics, yes, correct. I'm assuming you're talking about- I mean, there's considerable irony here. He was sort of whipsawed between apply to go forward because you can't do X, so you better get an accommodation for Y, and then he goes forward sort of over protest and does Y, and the employer comes back and says, uh-uh, you can't do it because you conformed the essential functions of your initial job. He couldn't get up to the plate and swing from the right side? He couldn't get up to the plate and swing from the left side? It looks like he was pretty much shut out. Well, Your Honor, I understand the position- Is that misapprehending the nature of the facts is all I'm asking? Well, I don't think you're misapprehending. I think that when you look at it like that through that lens, yes, but you have to understand that Mr. Maguire- Why is that a poor or inaccurate lens through which to look at the case? Because, in fact, Mr. Maguire did not want the package driver job. What he wanted was a full-time job inside. That's really what he wanted. All along? I thought that came up later. Well, that came up in May when he went and asked for the second FCE and said there's an inside job that I want, and if you look at his testimony, when he kept coming back for work, he kept asking to do stuff inside. Can I sweep? Can I do hazmat? If I can't do the heavy lifting, can I do that? And he wanted eight hours. And the problem was that there was no non-union position that wouldn't violate the collective bargaining agreement that would allow him to have eight hours as a full-time with full-time benefits. So that was the issue, and that's why I say through that lens, because they were trying to accommodate him when, in fact, he couldn't be a package driver, but yet he wanted eight hours, and that was the issue. So you're saying that in May he abandoned any request for being a driver? After he went back and got his FCE and they said he's cleared to drive except without being on narcotics, which, by the way, Dr. Rodriguez was asked that question, and he said it would be his opinion that nobody should ever drive on narcotics. And when asked about, and I'm sorry I'm not answering, but I just remembered that you had a question as far as whether Dr. Rodriguez was asked that question, whether he was qualified. He said nobody should ever drive on narcotics. And as a matter of fact, when he was asked, well, what if he took the medication in the morning? Would it be out of his system? And Dr. Rodriguez said, well, it's a case-by-case basis. However, there is a half-life to the medication, to the narcotic, to the oxy. What was the half-life, did he say? No, he just said there's a half-life, and he would have to know when that person took it, when the employee took it, and when the driving or whatever the function or essential job requirement he would be doing in order to be able to answer that appropriately. What I'm seeing with this case, and I think this oral argument has kind of highlighted it, is that there seems to be a degree of confusion over this issue about the narcotics and when the narcotics can kick in and whether he could have operated without the narcotics easily and kicked the narcotics. I mean, there's nothing firm about that. If the doctor had said something like, well, he's on narcotics now, but if he were off the narcotics, he could definitely do it, and there's no reason why he couldn't be off in two weeks, then we'd have something determinative. But here we don't seem to have much that's determinative, and I'm wondering whether this is better resolved by a jury. Well, I can answer that. There's a two-part response to that. First of all, Your Honor, I think there is sufficient in the record, because he was asked, Dr. Rodriguez, about narcotics and driving, and he said no one should drive, and we know for a fact that the doctor testified, and we know he was on narcotics because he had a prescription up through July. So even though the FCE said he's cleared for driving, we know he's on narcotics. I don't think that's a disputed issue of fact. He had a prescription, and he was on narcotics. As a matter of fact, he was on them when he did the second FCE. Well, help me with that. See, this is what I don't understand about what Rodriguez says. Rodriguez writes that note May 16th, 2013, to the boss, the UPS, in response to, can this guy work or can't he? Here's what he says. Based on the information of both functional capacity evaluations, he is released to full duty with no restrictions. The caveat is he can take anti-inflammatories for minor aches, but he can't take narcotics while on the job. He was a treating physician here. He prescribed opioids. He prescribed them before. He prescribed them at the time that he wrote this letter on May 16th, and he prescribed them through into the summer of 13. How does he say he can be released to full duty with no restrictions at the same time he says he can't take narcotics, at the same time we know he's on narcotics, because Rodriguez has prescribed the narcotics? I do not understand the letter. Well, that's because when the FCE was requested by the plaintiff, by the employee, he said he wanted an inside job. And Dr. Rodriguez clarifies that later on and says he is cleared for an inside job, not for the driving. Yeah, but was he ever asked, in words or substance, he, Dr. Rodriguez, in the deposition, to tell us what he meant when he said he was released to full duty with no restrictions? How could he have been released if you were prescribing and he was taking narcotics? Well, I think that goes back to the first one where they released him with the condition that it could only be medium to heavy. Yeah, but something changes. But then there's another. I mean, there are a series of letters from the treating physician. Sort of it's a work in progress. Correct. But I'm focusing on the May 16th letter. At that point, he says this guy can go back to work, full duty, no restrictions. There's nothing ambiguous about that. He doesn't say if he's weaned off the narcotics, if he's not taking them during the day, he's taking them at night. He's able-bodied guy. He can go back to work. And we later learned that during that F.C. Yes, that's correct, Your Honor. Why couldn't that be a basis from which you could argue to a jury on the central question, the second element, whether or not he was qualified, that the treating physician said he was? Because that wasn't the final opinion of the treating physician. He clarifies that May with a note first saying for an inside job, and then later on in August, I believe, in July, July 29th. Well, maybe he changes his opinion. No, he clarifies it. And he says it in the depot. I clarified it. What are you clarifying? He's qualified to work. I release him to full duty with no restrictions. And then he comes back and he says later that he was released only to an inside warehouse position. But that's an inside warehouse position is not full duty with no restrictions for the outside packaging job. I'm just saying there's an obvious substantial inconsistency between what Rodriguez says on May 16th and what Rodriguez says on July 29th. And I'm simply not asking the same question Judge Walker asked you, which is why are there not enough disputes of material fact going to whether or not he was qualified to do the function of that initial job so that summary judgment was improper for the judge to decide it rather than the jury? Because I think eventually when you look at the whole, if you just look at the May FCE, yes. That would be enough to take it to a jury, wouldn't it? If that was it. But you have to look at everything that followed afterwards. And I would disagree to a jury because I think there was legitimate nondiscriminatory reasons that would, even if he met the prima facie case of the ADA, that would still keep it from the jury. And what would that be? The two business decisions which were not rebutted below or on appeal, Your Honor, which alone is sufficient to grant, affirm the summary judgment, included one that they relied on. And that's why you have to look at the whole picture, not just in that microscopic moment of May. I have no doubt they perceived him as being disabled. I think the first prong is clear. The only question is whether or not there's a debatable issue of fact about whether he in fact was disqualified or qualified to do the job. Well, they perceived him as disabled because he said he was disabled. He filled out the checklist and his doctor said he was disabled. So the case law says that the perception is not, if it's not erroneous based on a recognized fact, then the ADA does not need to protect him. I would say that, number one. Number two, going back to the reasons, the legitimate reasons that were not pretextual, number one, he himself said he was disabled. He gave notes from his doctor. His doctor said he was disabled. His doctor said he couldn't drive, or at least do the package driver job. And secondly, the job that he wanted, the inside job, the full-time job, which is what he wanted and which he's complaining about, could not be given to him because of the collective bargaining agreement. He did not qualify, and they would have to have violated the seniority of other employees and that collective bargaining agreement. And the case law also supports that and says an employer does not have to provide an accommodation, create one, which is what Mr. McGuire wanted. He wanted to work two part-time jobs, but get full-time benefits. Counsel, let me shift you just for a minute to the workman's compensation claim. Just one question on that. On page six of the district court opinion, the district court, in looking at causation, said that there was no causal connection between the application for workman's comp benefits, which was February 2012, according to the findings of the district court, and the defendant's denial of work when he was cleared to return to full-time duty in May 2013. Then counsel supplied supplemental authority, which is an FDLE case. And in that case, I mean, excuse me, FMLA case, the prong of a prima facie case in an FMLA retaliation should be measured from the last day of the employer's FMLA leave until the adverse employment action at issue occurs. This reasoning that we have done in this circuit on FMLA, wouldn't that also apply to workman's comp? And shouldn't we take that May date and say, you look at that date for temporal proximity and remand to the district court saying you picked the wrong day? No, Your Honor, and I'll explain why. Because, first of all, you hit the nail on the head. Jones is an FMLA case, and here we have a case under the workers' compensation retaliatory statute, which expressly provides what the protected activity is, and that's when you measure the time. It says, and I quote, no employee shall discharge, coerce any employee by reason of such employee's valid claim for compensation. The case law in the federal circuits, and I'll read, federal circuits have interpreted the protected activity requirement as requiring an affirmative attempt to seek workers' comp. So the statute itself says that the affirmative act of seeking or attempting to seek workers' comp is the protected activity, and that's where the clock starts measuring. With the FMLA case, which is- Do you have any Florida cases that say that? I would cite two. Actually, it's a district court case, and it's 143-FEDSUP-3-1195, and it's Joback v. Michael Storrs, Inc. And in that case, Your Honor, it's instructive because it does cite Florida cases, and it says no published case in Florida has held that a workers' comp claim is viable in the absence of the filing of a workers' comp claim or an affirmative attempt. And then in that case, they say all federal district courts have also said that it's the affirmative act of filing the claim or attempting to seek the claim, which is the protected activity. And we know under the statute you need the protected activity, you need the adverse action, and then you need the causal connection between those two. So I don't think that Jones is applicable. And if you read Jones, it says, in the context of FMLA, it says it several times. It says because of this particular statute. We're dealing with another different statute, and we have lots of cases that say that you can't even start the clock running or measure the activity, the temporal proximity, from the time that the person's injured or the time that the person tells the employee that they're injured. It has to be the affirmative act of seeking workers' comp or attempting to seek workers' comp. Did that answer your question, Your Honor? Just to go back and close up, because I'm running. If you can, you're not running. You're over. I'm over. Sorry, Your Honors. That's all right. If you could just bring it to a close. I'll bring it to a close. I would just say, Your Honor, that he did not meet the qualified, that he did not meet the essential functions of a UPS package driver, so he did not meet that prima facie case. And I also would say even if that were the case, that there was legitimate nondiscriminatory reasons submitted which were never rebutted at the summary judgment at all, and that alone, or here on appeal, requires affirmance of the summary judgment, Your Honor. Thank you very much. Thank you very much. I'll try to be brief. Judge Black, in response to your question, I would point to the Bruner case which we cited in our brief, which was a case arising under the workers' comp retaliation statute, wherein the Florida Supreme Court held that it was not the filing date because that was a case where there was a nexus showing that the discrimination occurred more than two years later by a different employer. That different employer did not hire Mr. Bruner because he had previously filed a workers' compensation claim. So it's not the filing of the claim, Your Honor. The filing of the claim is essentially a sort of a condition precedent. If you have filed a claim and you later have a discriminatory act or a refusal to hire or whatever it may be under the retaliation statute or even harassment under that statement, such as in the Atha case, that's what matters. It's the time of the – when the problem arises. I mean Mr. Bruner had gone about his work, had done stuff for about two years. He applied for a new job. He got turned down because he had previously applied. And the Supreme Court said, hey, this is a protective statute. So I'm curious. In your complaint, you don't speak to the retaliation, facts of the retaliation. As an example, the 5% that UPS kept telling your client to take off. But yet you have that in an attachment to the complaint. Is there a reason why you didn't put that in the complaint? Stupidity? I don't know. No, I knew it at the time. That's why I attached it. It is in the original complaint, which was a sworn charge, which was sworn by my client. Just as my client said when he took this to HR at one point, Ivy from HR told him, this isn't right. They're going to get sued. This was when he was trying to go back to work full time. Let me ask you one question, just a practical question. I noted that the district judge's order that was issued by Judge Bucklow on June 26, 2017 was characterized as, quote, a sealed order, right? Yes, sir. And there's a footnote that she dropped saying, the order is sealed based on the court's reference to the exhibits, the depositions, and other materials that were placed under seal at the plaintiff's attorney's request. However, the court notes that pursuant to Local Rule 109C, the order sealing these materials shall not extend beyond a year. That time has expired. Are these materials all unsealed or do we have to unseal them? I would assume from that footnote that they are unsealed, but they are in your record, Your Honor, because they were submitted from you. Yeah, no, I understand, but I got a very heavily redacted version, and there is an unredacted version. But from your perspective, everything is unsealed by the natural operation of her order, is that right? That's correct. Okay, thank you. And let me go back to a misstatement that I think the UPS continues to make, is that my client was invited to do an ADA. He did the ADA. He was told on that ADA application, though he really didn't want to do it, that he was not qualified, that he could do his full-time job. Ultimately, under the ADA, he got the four hours part-time work in November, late November of that year, but that was termed an ADA accommodation. Now, two things. Mr. Rothman, the union agent, testified that he knew that there was eight hours of work that Mr. McGuire could do available, and if they wanted to do it as an ADA, they could do it any time. That he would do it, he offered that at his deposition. He said, I can create a position for Mr. McGuire that the company that will not violate the CBA, and we can go forward. And the company refused. And the other thing that I wanted to clear up is that when he asked for the warehouse job, it was not the only job he was asking for. He was asking for that job, if you read the specific request, that says, I am told there is a warehouse job. I would like to know if I'm qualified for that. And the doctor said, yes, you are. But again, every time, the doctor said, but no narcotics while you're working. And that continued, even though the doctor knew he was off. Thank you, counsel. Thank you both for your efforts. Thank you all.